Good morning everyone. It's such a pleasure to see everyone in the courthouse this morning and we are looking forward to speaking with you. We're going to start with our first case of the day and that is appeal number 22 3054 William Partin v. Baptist Healthcare. We'll first hear from the court. Michael Merrick. Thank you, Your Honor. May it please the court, counsel, my name is Michael Merrick and I'm counsel for the appellant, Dr. Randy Partin, who is present with me in the courtroom today. This is an appeal from the district court's grant of summary judgment in favor of the defendants and against my client, Dr. Partin, on all claims of his complaint and we asked the court to reverse the district court's opinion in its entirety and send the case back to the district court for a trial by jury. Dr. Randy Partin, for nearly 20 years, was an emergency medicine physician at Floyd Hospital in New Albany, Indiana and by all accounts, he was an excellent doctor. The CEO of the hospital, Dr. Dan Eichenberger, himself said, I still say if I was in a trauma situation or a life-threatening situation, I'd want Randy there. From an ER standpoint, he will go out of his way to save a life. Unfortunately, Dr. Partin lost his job because of an incident that happened on September 3rd, 2019 in the ER in which his medical judgment clashed with the wishes of staff members that did not wish to treat a patient that had come into the ER that day in need of treatment. The patient came in that day having twice tried to commit suicide by drug overdose and then running around on the interstate highway in high heat. Dr. Partin screened the patient and ordered certain stabilizing treatment he the patient's conditions, which included placing an IV line and ordering a rectal temperature to get a core body temperature. When the staff refused to implement those orders, Dr. Partin took his concerns up the chain of command and eventually talked to the CEO, Dr. Eichenberger himself, who agreed with Dr. Partin's recommendations for treatment and ordered the staff to treat the patient. However, the next day when Dr. Eichenberger found out the depth of the disagreement between Dr. Partin and the nurses and the discontent that the nursing staff had, he decided at that point that he was probably going to fire Dr. Partin. And that moment on September 4th when he made that decision gives rise to Dr. Partin's first claim, which is retaliation under the Imtiala whistleblower statute. So, Mr. Merrick, you know, as you summarize the facts, to me from your summary, at least, it sounds like there was a disagreement as to course of treatment. Of course, Imtiala does not address that particular issue or the quality of care. Imtiala is focused on whether or not Dr. Partin reasonably believed that the hospital intended to either discharge or transfer the patient. And so my question to you is, what are your best facts to support that proposition that Dr. Partin reasonably believed that the hospital intended to transfer or discharge the patient? I appreciate the question, Your Honor, because it gets right to the heart of the issue. Because the district court failed to apply the standard which the court just articulated, which is that it depends on Dr. Partin's reasonable belief about whether or not this patient was going to be transferred or discharged, as you say, without stabilizing treatment. And so Dr. Partin's reasonable belief in that moment was based on a number of things. First, when the patient first came in, some sort of hospital employee, she's listed as a certified nursing assistant in the records, Baptist disputes that, regardless, some hospital employee said the patient could leave without being treated. After that, a nurse named Laura Proctor came up and told Dr. Partin, or asked Dr. Partin, if this patient could leave without being treated, as Dr. Partin testified. What was the hospital's expressed reason for asking FEMA to withdraw your client from the hospital? What was the reason they gave? So the reason stated was in Dr. Eichenberger's letter of September 19, 2019 to FEMA. And he stated that Dr. Partin had violated certain hospital policies, and he cited a couple of policies, and he used this language. He said, by refusing to accept appropriate transfers and treatment and care for and on behalf of patients who were placed on a 72-hour hold, and for this reason he requested the removal of Dr. Partin. That was the stated reason. But in Dr. Eichenberger's deposition, he actually said that he didn't even believe that these policies were grounds for Dr. Partin's removal. He said he believed he could just request removal of Dr. Partin for any reason. Would you repeat that reason again? That didn't ring true. Certainly, Your Honor. In Dr. Eichenberger's deposition, he said he had a mistaken belief that under the FEMA contract, he could terminate Dr. Partin without cause, meaning he could terminate him for any reason. So he didn't even think he had to give a reason to terminate Dr. Partin. And so he said in his mind, he wasn't thinking of any policies that Dr. Partin had violated. Now, someone wrote this letter for him and he signed it, but he didn't actually have a grounds for belief in the policies that he put in this letter. And the policies in the letter said he refused to accept transfers. Correct. Is there any evidence in the record about refusing to accept transfers? I don't think so, Your Honor. Frankly, I don't even know exactly what that means because Dr. Eichenberger said he didn't even know what that meant either. I would say that this does go to Your Honor's point as well in terms of the evidence that the hospital may have intended to transfer or discharge this patient without treatment. This letter may be evidence that the hospital intended to actually transfer the patient because there is a reference to refusing to accept appropriate transfers. So possibly Eichenberger was saying we were going to transfer the patient? Who knows? I think that the root of the issue, though, was that Partin believed that the staff all wanted to discharge this patient without treatment. You mentioned that statements that the patient could leave, and I guess that raises two questions in my mind. One is, I understand that Dr. Partin put the patient on a 24-hour hold, and it's not clear to me from the record whether or not when a patient such as the patient here is placed on a 24-hour hold, whether the patient is free to leave against medical advice. That's one question. The second question is, isn't there a difference between a hospital official saying that the patient can leave if she wishes versus we want her to leave? Or we are intending to that once the patient was placed on a medical hold, she couldn't leave. Would that only support Partin's reasonable belief that he was being asked to essentially discharge this patient without medical care that she needed? Because he's the one that decides whether or not the patient can leave when the patient's on a medical hold. The treating physician places that medical hold on that patient, and so the treating physician is the one that would have to decide to lift that medical hold and allow that patient to leave so that essentially he perceived. Again, we're viewing this through Dr. Partin's reasonable perception that the staff is saying to him, this patient doesn't need to be on a medical hold. You, Dr. Partin, should decide to lift that hold and discharge this patient. In asking FEMA to withdraw the doctor, was any reference made in that letter to his past history in the hospital? I understand there's been some tension between him and the administration at times. Yes, I believe there there is a reference in that letter to his past history. Dr. Eichenberger doesn't cite any policy that he violated, but there is a reference to that, and I think the relevance of that is that goes to the tortious interference claim. Because when Dr. Eichenberger sent this letter, he had gone down this path of deciding I'm not going to take Partin, I'm not going to go into the bylaws, I'm going to try to go into the FEMA contract, I'm going to send this letter. And when he sends this letter, that letter itself commits two torts. One is defamation, because to your honors question earlier, the stated policies that Partin supposedly violated, Eichenberger knew he didn't violate those, so that's defamatory. But it also is tortious interference because he is exerting influence on Partin's person, and the question is whether that was justified for him to do that. That depends on a wide variety of facts to be considered by the trier of fact, and I think one of those would be was Partin historically a disruptive physician. That's what they would argue, we would disagree, and there's lots of evidence to the contrary. Mr. Merrick, tell me, what does the record show about communication between any of the nurses involved in this and Dr. Eichenberger in the window of treating and making decisions about this patient? Did they at some point express their view to Dr. Eichenberger? Who did it and what did they say? So that is a very important question, your honor. I appreciate that. The records seems to show that Dr. Eichenberger didn't have direct contact with any of the nurses actually involved in the treatment. He relied on Grace Marksberry, who herself is a nurse, and on Kelly McMenoway, who was the director of nursing. Primarily he relied on Grace Marksberry, and what Dr. Eichenberger said in his deposition was that the day after the incident, September 4th, he decided Partin was going to be fired unless he felt the nurses could continue working with Dr. Partin. He said that in his deposition, so he relied on Grace Marksberry to find out whether that there could be a collegial sort of But what does the record show how the nurses felt about discharging the patient on the day the patient came to the hospital, and was that ever communicated to Dr. Eichenberger? Well, yes, in the sense, your honor, that Grace Marksberry went to the nurses involved and asked them all to write up a written report on their concerns. Each of them wrote up a report called a safe report. And what did those reports say? They say a lot. They contain the nurses' feelings, their various disagreements with Dr. Partin's judgment, and I do believe Dr. Eichenberger testified that he read those. But if I recall, most of the nurses' complaints were about the forcible sedation and about the rectal temperature, not about their desire that J.C. be discharged and Dr. Partin's interference with that or objection to that. Is that correct? Could your honor repeat the question? I apologize. Judge Ripple asked you, what did the nurses say in their reports, in their safe reports? If I recall, their safe reports contained discussion about their discomfort with Dr. Partin's forcible sedation of J.C. and his insistence that the rectal thermometer, rectal temperature be taken. Those reports, by my memory, did not talk about how the nurses wanted J.C. to be discharged and Dr. Partin was interfering with that. Okay. So, correct. I don't think the nurses said in their reports that they wanted J.C. to be discharged. But there's other evidence that gave Dr. Partin a reasonable belief about that. So, back to the reasonable belief. Did Partin, I didn't see this in his deposition, did he ever see the hospital transfer or refuse to treat an uninsured patient? And if so, what were their circumstances? I don't think there's a specific factual example of that happening with a He testified generally that he felt, based on his 20 years of experience, that the hospital was loathe to treat, you know, psych patients in need. But there was no specific patient circumstances discussed other than patient J.C. It sounds to me, following up on my colleague's question, it seems to me that Dr. Eichenberger may have been somewhat less than candid in giving a reason for the discharge, but it didn't have anything to do of the doctor. But it didn't have anything to do with whether or not that patient was kept or not. It had to do with his deciding he had to put out a fight between the doctor and the nurses. There was a gang up, but the nurses ganged up on the doctor. And he sided with the nurses. I think that's exactly right, Your Honor. Dr. Eichenberger found himself faced with a political situation that he had to deal with, and that's why the medical staff bylaws are so critical. See, that goes back to Judge Lee's question, doesn't it, as to what does, whether this patient stays or not, have anything to do with what happened to the doctor. It sounds like what happened to the doctor was because things came to a head between him and the nurses and the hospital sided with the nurses. They ganged up. Well, I think that goes to the question of what was, did Dr. Eichenberger have a retaliatory motive? And that wasn't even actually ruled on by the district court. It has to be a retaliatory motive with respect to whether the patient stays or not. Yes, and there's a critical quote from Dr. Eichenberger's deposition where he said that if Parton hadn't, I'm paraphrasing, if Parton hadn't insisted on the treatment and disagreed with the nurses and made that call to Eichenberger, he'd probably still have his job, which means that Parton's fateful call to Dr. Eichenberger expressing his disagreement and his need to treat this patient was the reason for him losing his job. Mr. Merrick, what I'm puzzled by, though, is that, so Dr. Parton issues an order for a psychiatric consult, right, and that is yet to happen because under, as Dr. Parton sees it, the patient first needs to be stabilized before psych would see her, right, and everyone in the hospital, including nurses, know that the psych evaluation is going, is scheduled for some time in the future, and yet I don't see anything in the record where anyone says, you know what, she doesn't need a psych evaluation. It seems as though everyone was basically okay with her staying until she received the psych evaluation, but again, there was just some disagreement as to how best, whether or not she was stabilized and how best to stabilize her until that evaluation took place. Respectfully, Your Honor, the problem with that from my standpoint is it seems like the court would be interpreting the evidence in the light most favorable to Baptist. Well, I mean, I guess, I guess that would be the case if, I'm just trying to see what evidence you have on your side of the ledger, right, and so you say that there are statements that the nurses say that she can leave. You're telling me that if she wants to, and I think that was Dr. Parton's deposition. He said that when he talked to legal, they said that the patient wanted to. What you're telling me is that Dr. Parton, because he's the one that signed the, put her on 24-hour hold, knew that she couldn't leave unless he approved, and yet no one asked Dr. Parton to approve her leaving or transferring, and so despite whatever he might hear from all these other people, he himself knows that, you know what, unless I sign that release form, she, because of the 24-hour hold, is forced to stay, and so how is it reasonable in that context for him to take statements that the patient has the right to leave, whether or not that's true as a matter of law, and his knowledge that, you know what, unless he agrees, the patient can't leave because there's a 24-hour hold. I'm just trying to kind of understand kind of, again, kind of what facts you're relying upon in that to establish his reasonable belief. Thank you, Your Honor. Two quick things on that, and I see I've used up all my time in this one. I think you have to appreciate the heat of the moment in which this is happening, okay? This is a very fast-moving series of events, and Dr. Parton has multiple people saying to him that this patient can leave, so I think it's reasonable for a jury could find in that, when Parton is stuck in that moment, he's trying to treat this patient, everyone's saying she can leave, that he is thinking the hospital staff wants this person discharged. I think a jury could make that inference, and even if they didn't, if they just wanted to let her sit there indefinitely, without an IV, without a temperature, just sit there, that that also should be actionable. We cited some cases in our reply brief that say a hospital can't escape liability under EMTALA by saying, we didn't transfer or discharge this patient, we just let them sit here forever without stabilizing treatment, because that would undercut the heart of EMTALA. But the nurses weren't saying that they should just put her in the hallway and make her wait. I mean, they were monitoring her, they were talking to her, right, they were giving her fluids, I mean, they were providing some care, as opposed to some of those cases where you cite, where basically a patient was kind of deserted in the hallway or room somewhere. Your Honor, all I can say is that wasn't Dr. Parton's perception. I mean, he was trying to take care of this patient in the moment, it was a very serious situation. I'll reserve my time for rebuttal. Thank you.  Thank you, Your Honors. Obviously, my name is Rodney Scott, I represent Baptist Hospital and Dr. Daniel Eichenberger, and we're here to ask you to affirm Judge Sarah Evans Barker's 44-page opinion where she thoughtfully considered all of these issues and I think made the right calls on all of them. The first one, I believe, that we've focused on, obviously, is EMTALA, and there's been some suggestion here that the staff didn't want to treat this patient. That's just not the truth. The record from Dr. Parton's own deposition says, when we cited this throughout the briefs, pages 221 to 223, I think most of them, the staff, felt she needed it, but they were concerned, and legitimately so, I don't have a problem with them being concerned that she didn't want it. So the only dispute was whether or not the patient could refuse that care, right? Answer, yeah. I don't think, and I could be wrong, I don't think they felt like it was unnecessary. Do you understand that that could be a reasonable concern for nurses? Sure. Yeah, of course. I don't have a problem with that. They being concerned about it would be a reasonable thing to bring to their supervisors before something was done. Answer, absolutely sure. And that dispute about refusing, her right to refuse, didn't have anything to do with her income, her insurance, or anything else, or any improper purpose, in your opinion. And he said, no, he didn't think that did. These nurses wanted to help this patient. They were advocating for the patient that, in fact, she should be able to determine whether or not she wants to have an indefinite needle in her arm for some period of time, or a thermometer in her anus. And she described that as rape throughout the procedure. There were nurses crying during, during when they tied her down and did it. And so, yes, that's different entirely than what has been represented to you. I think, additionally, the suggestion that there were five people that somehow gave him the impression that she could leave is also not true. And one, nobody told him to discharge or transfer this patient. The record is less than clear on the procedures for discharge at Baptist Health. Was pardon signature necessary, or could she have been discharged with the approval of some other hospital official? Only with a doctor. She could not have been, she could not have... With a doctor, but need it have been pardoned as the initial treating physician. Sure. Could not have been the risk manager, for instance. That's not within the scope of their, their handling. And the risk manager, I think, is who he talked to, Tawana Schaffer. And then he said in his deposition, when he talked to Tawana, what did she, I asked, did someone in the administration order you or direct you to transfer the patient? And he suggested, it's Tawana. And she said, yes, you can let the patient leave AMA. You have completed your medical screening. So the answer to that question that he said was, could, you could release her, and it would be under AMA, which means she was leaving without permission of any medical provider. And if you look at the definition of transfer in the EMTALA Act, leaving without permission is not transfer. It's not a discharge. I guess, getting back to Judge Jackson and Kumi's question, if, hypothetically speaking, if the hospital had asked Dr. Partin to sign the discharge papers, and he said no, are there procedures by which another physician at the hospital could sign those discharge papers? Yes, there would have been a way to do that through the bylaws, but that, that never happened. He never, he never denied it, and I think that's what Judge Barker says. He, he says, his argument is that he prevented an EMTALA violation by advocating to Dr. Eichenberger, and when he did that, Dr. Eichenberger approved his orders. His precise treatment that he ordered for stabilization, his precise care was actually undertaken for this patient. Now, against her will, no question, but it was undertaken in this case. So it's, it's not reasonable or objectively reasonable at this time to suggest that there was any EMTALA violation or that he had any hope or it had any real belief, good faith belief about that, and I think his, his good faith belief has to be viewed in the context of his note. Nowhere in his note that's been made record does he say he was asked to discharge or transfer this patient. Nowhere in his email to FEMA when he complains about having been discharged, does he say in his internal email to his partners at FEMA, does he say it has anything to do with EMTALA or anything to do with being discharged or transferred? I'm interested in moving to the violation of the hospital's, this is your position, that he violated the hospital's policies. So that being the bylaws and the code of conduct. The freedom of contract is separate. So I believe it's the bylaws and the code of conduct. The code of conduct is the one that talks about disruptive behavior, right? Yes. Okay. Why isn't that a jury question about whether this, that, or this fundamental disagreement with the nurses rises to the level of actionable disruptive behavior? The nurses say we don't think she needs this course of treatment. He says, I think she does. I'm the doctor. So, you know, my way is the highway and I'll get approval of the, from Eichenberger. The nurses are uncomfortable. They complain. But why isn't that a jury question about whether that's disruptive behavior? Okay. Let me first say before I get there that none of these nurses talk to Dr. Eichenberger until after the event. All these safe reports come in the day after. That's where he learns that, in fact, he hadn't gotten the whole story from Dr. Parton. So that's a critical fact and you asked that question. I just forgot to follow up on it. With respect to your question, is if he contract, if Baptist contractually agreed that they were only going to discharge him for a violation of the Code of Conduct, then his breach of contract action would raise that factual question. But he is, we're not in that situation. He is one step removed as an independent contractor for FEMA. Baptist, it's sufficient that Baptist believed and thought that they, his conduct was disruptive and they put that in the letter of September 19th that he had been, he'd had this disrespectful and disruptive behavior continued and undermined patient safety and cooperation in the staff and created tension, hostility, and inappropriate environment. They had the right to make that judgment as, from their perspective, this is what we believe. Therefore, the September 19th letter says we're asking that you remove him from the list, from the doctors who original bylaws saying, because there are two bylaws that the parties addressed, that the original bylaws don't form or the later one don't form a contractual, direct contractual relationship between Dr. Partin and the hospital. Is that correct? Yes. All right. And so if you could clarify for me, so the parties throw around the amended bylaws, right? The October 2019 bylaws that seem to have some materially different language than the prior ones. When did those bylaws go into effect? Yeah, the record would be that they went into effect sometime after October 19, 2019, and I don't think the parties put it, floated that idea of the other bylaws. I think Dr. Partin has, but critical facts, what's material to this case for purposes of summary judgment, was that the original bylaws were in force and in effect when he resigned, when the conduct occurred, and when he resigned from the position, and when Floyd asked for it. So all of that occurred within the original bylaws. I think the second set of bylaws, the suggestion of that is a red herring. Doesn't have anything to do with the material facts in this case. And additionally, in this case, as Judge Barker concluded, these bylaws don't create a contract between the parties and they expressly say they're not contractual. They say that it's a privilege and that these are not contractual. I'm trying to understand how your answer is consistent if you're saying your understanding is the new bylaws went into effect sometime after October, October 2019, but all the relevant actions took place under the September 2019 bylaws. Certainly the hospital sentence letter requesting his removal from the hospital on September 19th, but his resignation took effect November 30th. That conceivably, based on what you're saying, could happen within the window after which the October 2019 bylaws went into effect. So I guess I ask again, do we have anything definitive in the record about when these October 2019 bylaws went into effect? We do not and I do not have that. All we have is that it was going to come to a vote sometime in October, but I still believe all the relevant facts occurred before. In fact, the resignation says I'm resigning effective this date. I'm going to be leaving the emergency room on that date. Nobody asked in between to change or alter that based upon some new bylaws. Additionally, I don't think you have all the records for that new set of bylaws because the bylaws themselves say they come in three different packages. The rules and regulations, the code of conduct, and the bylaws. All three of those things and you don't have that whole package. So I don't think you have a view of everything that would have happened in October of 2019 and the plaintiff didn't produce those. So Dr. Parton sent the letter of resignation dated October 1st. Is that correct? Correct. And then Dr. Eitenberger at some point sends a letter to Floyd, FEMA, kind of saying, acknowledging that Dr. Parton no longer has privileges at the hospital. Can you remind me when that second letter is dated? That second letter occurred in April of 2020 and that was pursuant to the contract with FEMA, which I think is the difference here. Floyd could have asked for his removal under the contract or they could have asked for it under peer review. There were two masters for the people who were in fact the doctors working for an independent contractor who had an exclusive arrangement. So your argument is that as of October 1st when Dr. Parton sent the resignation letter, all of his rights had basically been addressed. Yes. And he had given up any opportunity to amend the bylaws. Well, correct. Correct in part because also the amended by there was no action under the bylaws that had ever been taken against his privileges. There were, you know, there are specific things listed as what is adverse action from which you have a right to appeal and a right for a hearing. None of those things involve what occurred in this case. Because the amended bylaws don't include resignation as one of those actions where they process. Neither the original or the or the new ones provide for that. And your position on the code of conduct is that can't be a standalone thing. Correct. It's a three. It's a it's well they say you are governed by these three documents. So they are standalone in part but it's a combination of obligations not just one set of obligations. So Mr. Scott, putting the MTALA claim hypothetically speaking to the side for a second, without the MTALA claim what can plaintiff in your view make out a tortious interference claim or a defamation claim? No. And let me address the tortious interference first. I believe that clearly the case law and the standard for tortious interference is an absence of justification. An absence of justification in Indiana means malicious, a malicious one, unmixed with any other and exclusively directed to injure and damage another. You don't believe that the restatement should apply? I believe the restatement is just a consideration. All it says is these are considerations that you can consider in determining whether or not your actions were justified. Whether or not there was a justification. And we cited those to the judge at page 47 in our trial brief and we certainly believe Judge Barker considered those elements. But those elements would include certainly the public policy in allowing a hospital such as Baptist to have control over its 24-7 operations in an emergency room and determining who gets to practice in there or not practice in there. The public policy of having an efficient and running and operational emergency room is critical to the community, critical of the health care system, and certainly we think there was more than enough public policy reason to believe that he should be able to proceed in that direction. I think Judge Barker, who's been sitting there in Indiana for a long time, reads Indiana law correctly. She does not have to list the seven factors. We're not allowed to. We're not allowed to defer to Judge Barker on the content of Indiana law. The Selby-Regina College against case makes that very clear. Oh, I agree. I'm just saying that I think she did consider those things. The sterling reputation of the district judge really isn't a factor in our decision. Defamation, if I could turn to that at your request. In this case, it was a protected and privileged communication. It was never published to anybody who didn't have the right to have it. Exhibit A, which was the FEMA contract, paragraph 11 says, any conduct or activities that might affect FEMA's ability to perform services for Floyd, they have to get notice from Floyd about. And that's, in fact, why the letter was written to FEMA. It was not published to anybody else. It was not published within even Floyd. Dr. Parton agreed that that was proper and that they had a right to know and receive that communication from Dr. Eichenberger. He may not have liked the contents of it, but it was certainly a protected, privileged communication. It was not published. It was contractually required. But wouldn't the communication that Dr. Eichenberger provided to, I don't know whether it's Dr. Wurst or Mr. Wurst, regarding Dr. Parton fall within the type of employee evaluation information that the Indiana Supreme Court found to be publication under the Balls case? I don't believe so, Your Honor, because one, he wasn't an employee of Floyd. Well, I know, but you're saying, but if in fact even an intra-company communication between, you know, a supervisor and a company decision-maker would be considered publication, surely don't you think that under that rationale the Indiana Supreme Court would consider a letter such as the one that Dr. Eichenberger said to be published, in a sense, as required under the defamation claim? I don't, but nonetheless I think the second question is, would there be a qualified privilege for what he said in the letter? And the opinion or the case law on that is also relatively clear that he has a right to communicate things about his opinions about what has gone on with Dr. Parton and his ability to function in the ER with the nurses, and he's certainly allowed to convey that opinion as long as he doesn't excessively publish it. In this case, that never occurred, we know, and as long as he did, he had a basis for his opinions, and the record, the thousands of pages records in this case, is certainly established he had, he had a basis for his opinions, and then, so I think in this case he clearly met that those conditions of the qualified privilege, and it goes similarly to Ms. Marksberry's email. Like Ms. Marksberry's email, Dr. Eichenberger's statements are opinions, and opinions are certainly outside the reach of a defamation claim as long as there's a Grace Marksberry's email. In fact, if you read that, she says at least in five different places, I believe, I do not think, I believe, I do not think, I do believe, I stand by the nurse's conviction to advocate for their patient, and that Dr. Parton's documentation did not reflect the truth. Those are all opinions that she was able and qualified to express, and in fact needed to be reviewed by her superiors so that a decision could be made, and the emergency room operations could get on with their daily functions, and the nurses could be satisfied that they were, they were being addressed properly. Satisfying the nurses seems to be very important at that hospital, doesn't it? Well, I think it's important to any hospital with an emergency room because there's 24-7 operations, and nurses are critical to the operations there, like this one. Yeah, and there's a shortage. Yeah, and like this one, there's only one doctor on the nurses, or nurses required. Yes, the, you know, the problem you've got to overcome is this just looks like a gang-up on a doctor. Sure, and I would, I would just suggest that this is, this is outside the norm in any form or fashion. This is not a gang-up situation for a particular event. This, the nurses in this scenario were very, very unusual set of circumstances. We had a psych nurse who refused to participate in the order to tie down the patient and insert. We had a, the charge nurse call the judge about the EDO and say that she didn't have to, he didn't have to, she could deny treatment. We had a, the treating nurse, the primary nurse, crying as the, as the procedures or the treatment is being provided. We had a provider who's, he would say, supported his staff and evaluated that, not just on what the staff said. He also, his testimony is complete with, with evidence that he thought he was misled by those, by Dr. Partin during the phone call, but the, that Dr. Partin didn't disclose, they, critical facts about the patient, and so that also he wanted his ability, if I'm going to be in this role and you're going to call me for advice to authenticate your records, I need to be able to rely on you. So it was his opinion in addition to the nurse's. He said this in his, what, deposition, right? He said it in his deposition, and he said that, he said that contemporaneously in the emails. To, to whom? To, I apologize, maybe I missed that. I thought it was to Grace Marksberry, but he, he thought he had been misled about what happened. He never expressed that to the doctor, though? Not in the letters, no. He did not. He did not. Mr. Scott, the email that Nurse Marksberry said to Nurse McMenoway, was she asked to give her, was, to give her response or her reviews? Yes, and I think that the evidence in that is in, is replete in the record that Dr. Eichenberger asked the VP of Nursing to go to her direct report, which was the director of the emergency room, and asked if she thought there was a way forward, that she was supposed to talk to Dr. Wurst, who was the FEMA director, medical director, and find out if there was a way forward that the relationships between Dr. Partin and the nurses could be repaired in the emergency room such that they could continue to work together or not, and that is what Grace Marksberry was asked to comment on, and that's what, that was what generated her email. If I could just briefly comment, too, that the, in this case, obviously, there is a breach of the FEMA contract that is alleged, and there's been some suggestion that somehow the FEMA contract, the no third-party benefit language, was in some different agreement. I would just point out that Exhibit A to the Motion for Summary Judgment, page 29, which includes that, includes the HIPAA business agreement attachment, which says there's no third benefit to third parties and no rights accrued to any third parties to the contract, but it says in the prefatory paragraph, this HIPAA agreement supplements and is made part of the exclusive emergency care agreement between Baptist and FEMA. I think that clearly makes this part of the contract, and as Judge Berger said, the law in Indiana, Penrod versus Quality Care, is if there's a contract provision that expressly states there's no third-party beneficiary, then that alone is enough to defeat a third-party beneficiary claim. Mr. Scott, with regard to Dr. Eichenberger's concerns as to Mr. Parton's history, you know, in the record we see that there were some issues in 2013, maybe going on to 2014. Dr. Parton then participated in some training sessions or what have you. Is there any evidence in the record that there were any ongoing concerns between 2014 and 2019? There are. There is. First, in 2015, there was also a medical MEC committee hearing that asked him to attend a class, but in addition to that, there was testimony from Linda Minton, who was the emergency room director, and from Laura Proctor, who was charged nurse, that there had been ongoing problems with Dr. Parton's behavior in the emergency room, and Dr. Eichenberger, who said he'd always received reports that there was always something going on with Dr. Parton. So, yes, there is. After 2015? After 2015 through 2019. They both talked about that time period specifically. Laura Proctor and Linda Minton both talked specifically about that time period, and I would think it's important to note that Dr. Ponner, who was Dr. Parton's partner, made these recommendations. He was part of the MEC. Dr. Eichenberger was not part of the MEC. These came from his partner saying he needed to change his behaviors, and Dr. Ponner said the night of, he's lost his job because this is an emotional turmoil I've never seen in the emergency room. I'm out of time. Thank you so much. Mr. Merrick, you were answering a question from Judge Lee when you ran through some of your rebuttal time, so you'll get that back. Nine minutes, please. Thank you, Your Honor. Pardon me. Judge Ripple commented that this seemed like a gang up on a doctor by nurses, and that illustrates why it was so important to evaluate it under the medical staff bylaws. There's a process for a disinterested committee of doctors to do an actual investigation, have a hearing, and for Dr. Parton to present his side, and if it's found that he violated code of conduct or what have you, then there could be action taken against him. Instead of going under that process to decide what to do about this gang up of nurses, Dr. Eichenberger relied on a nurse herself, Grace Marksberry, who actually didn't even confer with those nurses on whether they thought they could work collegially with Dr. Parton going forward. The nurses testified that she didn't come ask them that, and the person that she did talk to on the same day that she sent her email to Dr. Eichenberger, September 10th, was a pharmacist named David Roy, who apparently was a friend of hers in the ER. He had nothing to do with this incident whatsoever, no knowledge of it, but yet they're chattering back and forth on instant message saying some profane things about FEMA and how they're gonna get drunk if Parton gets axed, and this is really offensive and shocking to think that a doctor could lose his job based on that kind of innuendo and behind-the-scenes chatter rather than having his rights evaluated through the medical staff bylaws that exist for exactly that purpose. So Baptist's position is that Dr. Eichenberger had the option of one or the other, right? That he could have gone directly to FEMA, expressed his concerns under the contract the hospital had with the medical staff committee. Do you, what is your position with regard to that? Did he have that choice? No, Your Honor. Our position is he was required to go into the medical staff bylaws. And why? Because the medical staff bylaws, first of all, at page 26 and 27, they list every conceivable type of physician conduct to be evaluated at that hospital, and then it says later that the, they use mandatory language, whether it's the earlier bylaws or the later bylaws, physician shall be entitled to a hearing, will be entitled to a hearing before his privileges are revoked. So the intent of the bylaws is that a physician cannot be removed from service at this hospital unless we evaluate him under these provisions. And I think that can be read harmoniously with the FEMA contract. So the FEMA contract has a clause, section 1e, that says that one of the FEMA doctors must be removed if certain things happen. And there are things like if a doctor commits a felony, if a doctor loses a medical malpractice insurance, if he loses his license, and if he violates hospital policies or the bylaws. So if one of those things happen, then he can be removed under the FEMA contract. But the entity that decides whether or not that has happened, whether or not those policies were violated or the bylaws were violated, is the medical staff. That's the intent of the bylaws. Mr. Burke, if Dr. Parton does not have an EMTALA claim, does he still have a tortious interference and defamation claim? Absolutely, Your Honor. So as I alluded to earlier, when Dr. Eichenberger decided to send that letter demanding that Parton be fired, that committed the torts of defamation and tortious interference. And on the tortious interference claim, the district court dismissed that based on a misapplication of the law. We believe that under the Supreme Court, the Indiana Supreme Court case of Winkler, that the restatement factors do control whether or not interference with the contract was justified. It's a multi-factor analysis. At the end of the day, it's a jury question about whether the defendant's conduct was fair and reasonable. It says if there have been misrepresentations in the interference, if there have been undue economic coercion as part of the interference, those could be the kind of things that could constitute unjustified interference. And that's exactly what happened here, because as I discussed earlier, Dr. Eichenberger's letter contained misrepresentations. He said Parton violated policies without even believing he had violated those policies. Additionally, Dr. Eichenberger's letter is a classic example of undue economic coercion. He knew that just sending a letter to FEMA saying please remove Dr. Parton might not work, so he went beyond and threatened to cost every doctor at FEMA their job, and he intended to do that. He said in his deposition he knew exactly what he was doing. He actually used the word livelihoods in his deposition. He knew he was putting the livelihoods of every FEMA doctor at FEMA to remove Dr. Parton from service. So a jury could consider that, all the other evidence, and consider whether that was inappropriate. And along with that, I'm sure the jury would will consider, if this court remands the case for trial, Baptist's argument that Dr. Parton was somehow an intolerable person, disruptive, and they will want to dredge up the issues from 2010, 11, 12, and so on. Now I think we'll get to do an argument about whether that, to what extent any of that's not true, and the rest of Baptist's documentation undermines that. And a jury could believe that by the time 2019 came around, Dr. Parton was not a disruptive position, if he ever was, which he wasn't. There's no record to support that, and for years he was given stellar reviews whenever his privileges were re-upped. Every single time, there are categories for professionalism, behavior, cooperation with colleagues, satisfactory from at least 2015 to 2019. So a jury could look at this stated so-called justification, and believe that it's absolutely false, and that the interference with Dr. Parton's employment was improper. If I could, Your Honor, on the FEMA contract real quickly, I did want to address the third-party beneficiary issue, because I haven't yet. There's a good Indiana case called Lacey that says that we would ask the court to apply a commonsensical interpretation of the FEMA contract in evaluating whether Dr. Parton had the right to enforce it. We're not saying he had the right to enforce every single provision of the contract. The whole 30 or 40-page contract is not at issue. What is at issue is Section 1E, and whether a FEMA doctor has the right to enforce that if he is improperly removed. And we think, commonsensically, he must. Those provisions exist for the doctor. It doesn't say that a doctor can be removed without cause. Rather, it says he can only be removed if certain things occur, and those are protections for that doctor to safeguard his job. Importantly, the contract does not have a disclaimer of third-party beneficiaries. As the court is surely aware, in commercial contracts, it's quite commonplace for the parties to have a disclaimer of third-party intent when they intend to disclaim third-party beneficiaries, and these parties made a conscious choice not to do that, and I think that speaks volumes. So we would ask the court to, oh, additionally on that point, Your Honors, although no Indiana court has had the occasion to decide whether a physician is a third-party beneficiary of this group's contract, other cases outside of Indiana have found so, and really without much controversy, because it simply seems intuitively obvious that a doctor should have a right to enforce these kind of provisions in his group's contract. Briefly, Your Honor, I want to make sure that the court understands that our defamation claim is based not only on Dr. Eichenberger's letter, but also on Grace Marksberry's email of September 10th, in which she made certain statements to Dr. Eichenberger that were damaging to Dr. Parton's reputation. These were not opinions, or I should say if an opinion implies underlying facts, it can be defamatory, and one of the critical things she said, because Dr. Eichenberger had reposed, you know, confidence in her to figure this out, she said, I do not think I can convince the ED staff to continue supporting him. That was a false statement. That implies that Dr. Parton is an intolerably disruptive person to work with, and it's false, because she did not even go talk to those people to find out whether or not they could, so she had no grounds for belief in its truth. Thank you. Thank you, Your Honor. We thank both Mr. Merrick and Mr. Scott, and the case will be taken under advisement.